## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **ROY CECIL HESS, JR.,** | ) | |
| Plaintiff, | ) | Civil Action No. 1:09cv00026 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will affirm the decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Roy Cecil Hess, Jr., ("Hess"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Hess's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g). (West 2003 & Supp. 2009).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

1

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hess protectively filed his application for DIB on April 4, 2006,[1] (Record ("R."), at 89-93), alleging disability as of April 3, 2006, (R. at 89), due to Barlow's syndrome, chronic fatigue, lumbar disc problems, heart palpatations, sciatica, depression, pain in pelvic and prostate area, breathing problems and arthritis. (R. at 103.) The claim was denied initially and upon reconsideration. (R. at 47-48.) Hess then requested a hearing before an administrative law judge, ("ALJ"). (R. at 61.) A hearing was held on December 12, 2007, at which Hess was present and represented by counsel. (R. at 22-46.)

By decision dated February 5, 2008, the ALJ denied Hess's claim. (R. at 12-21). The ALJ found that Hess met the insured status requirements of the SSA through December 31, 2010, and had not engaged in substantial gainful activity since April 3, 2006, the alleged onset date. (R. at 14.) The ALJ found that Hess suffered from the following severe impairments: obesity, borderline intellectual functioning, anxiety, depression, chronic obstructive pulmonary disease,

---

[1] While the record does not contain a document containing when Hess protectively filed, the ALJ and Hess both indicated that the claimant filed on April 4, 2006. (R. at 12; Plaintiff's Motion for Summary Judgment at 1.)

("COPD"), and/or pneumonitis, degenerative arthritis and mitral valve prolapse with atypical chest pain. (R. at 14-15.) However, the ALJ noted that Hess did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ determined that Hess had the residual functional capacity to perform light work[2] that did not involve more than occasional climbing, balancing, kneeling, crawling, stooping and crouching. (R. at 16.) Further limitations noted by the ALJ included that Hess could not work in environments with air pollutants or irritants, wetness, temperature extremes or excessive humidity. (R. at 16.) Additionally, the ALJ found that Hess was limited to simple, routine, repetitive tasks that would require only occasional interaction with the general public and that Hess could not work around hazards, such as unprotected heights and/or dangerous/moving machinery. (R. at 16.) The ALJ decided that Hess could not perform any of his past relevant work and that the transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Hess was "not disabled," whether or not he had transferable job skills. (R. at 19-20.) Based on Hess's age, education, work experience and residual functional capacity, the ALJ found that other jobs existed in significant numbers in the national economy that Hess could perform, including jobs as a housekeeper, a stock clerk and an office machine operator. (R. at 20.) Accordingly, the ALJ decided that Hess was not under a disability as defined by the Act. (R. at 21.) See 20 C.F.R. § 404.1520(g)(2009).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567 (b) (2009).

After the ALJ issued her decision, Hess pursued his administrative appeals and sought review of the ALJ's decision, (R. at 7.), but the Appeals Council denied his request. (R. at 1-4.) Hess then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is now before the court on Hess's motion for summary judgment, which was filed August 14, 2009, and on the Commissioner's motion for summary judgment filed on September 3, 2009.

## *II. Facts*

Hess was born in 1955, (R. at 89), classifying him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(c). Hess graduated from high school and completed one year of college. (R. at 108.) Hess testified that entire employment history consisted of his work on the conveyor, as a "belt man" in the coal mines. (R. at 26.)

Hess testified that he suffered from shortness of breath, which he believed was caused from working in the mines and being exposed to diesel smoke. (R. at 26-27.) Hess stated that he was on medication to help with his shortness of breath, but that he had never required emergency care over the problem. (R. at 27.) Additionally, Hess claimed that he had heart palpitations, chest pains that required him to carry nitroglycerin, bowel problems, pain in his hip joints and down his tail bone, arthritis, a broken rib and fatigue. (R. at 28.) Hess testified that he was

treated for depression once every three to four weeks and had never been hospitalized for psychiatric care.  (R. at 28-29.)

Hess alleged that he had trouble walking, stating that he could only walk 10 to 15 minutes before he would be out of breath and need to take a break.  (R. at 29.)  Hess further testified that his back hurt when he stood because he had "wor[n] out joints."  (R. at 29.)   When asked what his doctors said about his back, Hess responded that the doctors told him he had some discs that were "wore out."  (R. at 29.)  Hess claimed that when standing his hips, joints, knees and ankles bothered him.  (R. at 33.)  Hess testified that he had trouble sitting due to hemorrhoids and pain in his tailbone.  (R. at 30.)  Hess opined that he could lift 20 to 30 pounds, but stated that he tried to limit his lifting.  (R. at 30.)   Hess also asserted that he experienced pain in his back, joints and knees when attempting to kneel, explaining that it was difficult to get up and down.  (R. at 33-34.)  Furthermore, Hess claimed that he experienced dizziness when getting up from kneeling.  (R. at 34.)  Additionally, Hess alleged that bending bothered his back and knees.  (R. at 34.)

Hess testified that when he woke up in the morning he typically drove his son to college, approximately 12 to 15 minutes from his home.  (R. at 30.)  After dropping off his son, he would visit and have breakfast with his uncle before returning home to rest.  (R. at 30.)  Hess stated that he did not need any help to dress or bathe himself.  (R. at 31.)  He also testified that despite taking arthritis medication and having swollen hands, he was still able to use his hands.  (R. at 31.)

Hess alleged that, due to constant tiredness, Dr. Sutherland diagnosed him with chronic fatigue. (R. at 31.) Hess claimed that he had trouble sleeping, despite feeling tired constantly, which required him to take one or two naps daily. (R. at 32.) Hess stated that when he went to bed at night he was awakened three to four times by pain, nightmares or noise from nearby train tracks and a fire department. (R. at 32-33.)

Hess testified that his grip strength had weakened, which caused him to be unable to hold objects very long, explaining that he became nervous if he tried. (R. at 34.) Hess acknowledged that his son performed most of the lifting around the house, but admitted that he carried some of the groceries. (R. at 35.) Hess disclosed that he did the laundry, but claimed that his son lifted and carried it. (R. at 35.) Hess asserted that he could only drive 45 minutes to an hour at a time, claiming that it caused him to experience soreness. (R. at 35.) Hess disclosed that he did not do a lot of household chores, but stated that he vacuumed once every two weeks, cooked and washed the dishes. (R. at 35.)

Hess asserted that when he worked in the coal mines he earned $20 per hour, but now he did not have any income other than his savings. (R. at 36.) Hess stated that not working made him feel degraded and like he had not accomplished anything. (R. at 36.) Further, Hess claimed that, when he was able to work, he enjoyed it. (R. at 36.) Hess stated that he occasionally suffered a crying spell when he thought about "things." (R. at 36.) Hess alleged that several times a week he was so depressed he did not want to be around anyone or talk to anyone. (R. at 36.)

Other than going to church, Hess claimed he did not engage in social activities. (R. at 37.)  Hess admitted to visiting his uncle frequently and visiting with friends several times a week. (R. at 37.)  Hess stated that he would go out to eat and to the movies occasionally, although, he claimed he did not go to the movies as often as he did in the past. (R. at 37.)  Hess testified that he never liked to read and stated that he could not read well because he did not understand the words or what they meant. (R. at 37-38.)  Hess claimed that he watched television occasionally, but that after working in the dark so many years, lights bothered his eyes and sometimes he fell asleep while trying to watch television. (R. at 38.)  Hess stated that, because of his past work schedule, he had never developed any hobbies. (R. at 39.)      Hess claimed that in April 2006 Dr. Sutherland told him that he needed to stop working. (R. at 39.)  Hess testified that he had been seeing Dr. Sutherland since 2004. (R. at 39.)

In addition to Hess, the ALJ heard the testimony of a vocational expert, Anne Marie Cash. (R. at 40-44.)  Cash classified Hess's prior employment in the coal mines as heavy,[3] semi-skilled employment. (R. at 41.)  The ALJ asked Cash to consider a hypothetical individual who retained the residual functional capacity to perform light work, sit and stand six hours out of a typical eight-hour workday, who could occasionally climb, balance, kneel, stoop, crawl and crouch, and needed to avoid exposure to polluted environments and was limited to moderate exposure to respiratory irritants, excessive wetness, humidity or extreme temperature

---

[3] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying objects weighing up to 50 pounds.  If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2009).

change. (R. at 41.) Also, the hypothetical individual should avoid work around hazardous machinery and unprotected heights, climbing ladders, ropes and scaffolding or working on hard surfaces. (R. at 41.) Furthermore, the hypothetical individual would be limited to simple, routine, repetitive, unskilled, tasks and could only occasionally interact with the general public. (R. at 41.) Under that hypothetical, Cash opined the individual could not return to Hess's previous employment. (R. at 42.)

Next, the ALJ asked Cash to add to her consideration that the individual was closely approaching advanced age, with a high school education and Hess's past work experience. (R. at 42.) The ALJ inquired as to whether there were significant jobs in the national or regional economies under that hypothetical. (R. at 42.) Cash found that unskilled, light jobs in housekeeping, as a stock clerk or an office machine operator would be available. (R. at 42.)

In the next hypothetical, Cash was to assume that Hess's testimony was credible and supported by medical evidence, specifically, that the individual could walk for 10 to 15 minutes, sit for 20 to 30 minutes, lift no more than 30 pounds and would need to nap during the day. (R. at 42.) Under this hypothetical, Cash opined that the individual could not perform Hess's past work. (R. at 43.) The ALJ then asked Cash to add to her consideration someone of Hess's age, education and past work experience. (R. at 43.) Under that set of facts, Cash opined that the individual would be precluded from all employment. (R. at 43.)

Cash was then asked to consider the limitations contained in Exhibit 5F[4] and assess whether Hess would be able to perform any of the jobs listed in response to the ALJ's second hypothetical. (R. at 44.) Under that scenario, Cash found that all employment would be precluded, including that which was previously listed. (R. at 44.)

In rendering her decision the ALJ considered medical evidence from: Cardiovascular Associates; Johnston Memorial Hospital; Dr. J. P. Sutherland, Jr., M.D.; L. Andrew Steward, Ph.D.; Associated Counseling Services, Inc.; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Muhammad R. Javed, M.D.; Dr. Frank M. Johnson, M.D.; Dr. Tushar F. Patel, M.D.; Dr. Donald Williams, M.D., a state agency physician; Buchanan General Hospital; Dr. J. N. Patel, M.D.; Stone Mountain Health Services; Dr. Glen E. Vance, Jr. D.D.S.; Dr. Shirish Shahane, M.D., a state agency physician and Richard J. Milan, Jr., Ph.D., a state agency psychologist.

On November 18, 2004,[5] Hess was treated by Dr. Larry H. Cox, M.D., F.A.C.C., at Cardiovascular Associates, P.C., after being referred by Dr. J. P. Sutherland, M.D. (R. at 176-179.) Hess was referred to Dr. Cox because of chest pain, dyspnea and fatigue. (R. at 176.) Hess reported that he had trouble with sleeping and fatigue, stating that he was tired all the time and had trouble sleeping at night. (R. at 176.) However, Hess claimed that during the day he would fall

---

[4] Exhibit 5F is a Functional Mental Status Evaluation, completed on July 10, 2006, by L. Andrew Steward, Ph.D. (R. at 235-37.)
[5] Evidence outside of the relevant time period, April 3, 2006, through February, 5, 2008, is included only for clarity of the record.

asleep while trying to read or watch television. (R. at 176.) Additionally, Hess indicated that he had been told he snored loudly, he had shortness of breath on exertion, had experience chest pain that lasted for a few seconds for approximately a year and that he slept on two pillows at night, but did not have edema. (R. at 176.)

Dr. Cox noted that Hess had no history of hypertension, diabetes or hyperlipidemia and that Hess quit smoking in the 1970s after having smoked for only four years. (R. at 176.) Dr. Cox found that aside from Hess's mother's congestive heart failure, there was no family history of heart disease. (R. at 176.) Hess's medical history included a hemorrhoidectomy, bronchitis, pneumonia, hiatal hernia, anxiety, depression, gout and possible coal worker's pneumoconiosis. (R. at 176.) Hess's symptoms included heartburn, occasional alternating constipation and diarrhea, joint pain and back pain. (R. at 176.)

Dr. Cox's physical examination of Hess revealed that Hess was in no distress, was alert and oriented, had a normal pulse, his respirations were not labored, there were no definite murmurs, gallops or rubs, no edema and his peripheral pulses were intact. (R. at 177.) The results of Hess's stress test led Dr. Cox's colleague Dr. Eduardo Balcells, M.D., F.A.C.C., to note that Hess had a normal exercise cardolite study demonstrating no evidence of ischemia or prior infarction with ejection fraction of 70%. (R. at 178.) Further, it was noted by Dr. Balcells, that Hess had a "normal stress test" and had "above average" functional capacity. (R. at 179.) Dr. Cox assessed Hess with chest discomfort, noting that the probabilities of coronary disease are quite small with Hess's atypical chest pain

and normal stress test, and possible obstructive sleep apnea.  (R. at 177.)  Dr. Cox recommended that Hess participate in a sleep study.  (R. at 177.)

On January 27, 2005, Hess presented to Johnston Memorial Hospital, ("JMH"), so a polysomnagram could be performed.  (R. at 180-82.)  Hess complained that he had recurrent problems with sleep for six months; the problems included tossing and turning, increased latency to persistent sleep, increased daytime hypersomnolence and chronic daytime fatigue.  (R. at 180.)  Additionally, Hess reported his sleep was disturbed by anxiety, depression, muscular tension and thoughts running through his head.  (R. at 180.)  Also, Hess claimed to have "creeping-crawling" feelings in his lower extremities and would have chronic pain or just suddenly become alert while attempting to sleep.  (R. at 180.)

The total sleep time for the study was 351 minutes, with a sleep efficiency of 89%.  (R. at 181.)  The latency to persistent sleep was decreased to 13 minutes, wake after sleep onset was 29 minutes and there were a total of 71 arousals with no awakenings.  (R. at 181.)  Dr. Emory Robinette, M.D., assessed the study and found that Hess did snore, periodic leg movements were present and associated with recurrent arousals, there was no significant disordered breathing and Hess did suffer some oxygen desaturation.  (R. at 182.)  Dr. Robinette diagnosed Hess with periodic leg movement disorder, opined that Hess needed to lengthen total nightly sleep time and prescribed Mirapex.  (R. at 182.)

On October 6, 2004, Hess presented to Dr. J. P. Sutherland M.D., complaining of shortness of breath, palpitations and problems with his lungs. (R. at 192.) Dr. Sutherland noted that Hess had a regular heart rate and rhythm with no evidence of rubs or thrills and Hess's lungs demonstrated coarse rhonci with inspiratory stridor and expiratory wheeze. (R. at 192.) Dr. Sutherland noted that Hess was obese, had hyperactive bowel sounds and midepigastic tenderness. (R. at 192.) Additionally, Dr. Sutherland observed that Hess had bright erythema of the posterior pharynx, nasal turbinates with swelling of the nasal mucosa and that the extremities had no edema or cyanosis. (R. at 192.) Dr. Sutherland diagnosed Hess with chronic bronchitis/emphysema, hyperlipidemia, palpitations with recurrent atypical chest pain, hypoglycemia and maxillary sinusitis. (R. at 192.) Dr. Sutherland scheduled Hess for further testing and prescribed Theophylline, Bidex, Erythromycin and Zoloft. (R. at 192.)

On November 16, 2004, Hess presented to Dr. Sutherland because of an earache and sore throat. (R. at 191.) Hess's heart was normal and his lungs exhibited fine rhonci with inspiratory stridor and expiratory wheeze. (R. at 191.) Dr. Sutherland diagnosed Hess with strep pharyngitis, left otitis media and upper respiratory infection. (R. at 191.) Dr. Sutherland prescribed Cortisporin, Cipro and Zanaflex. (R. at 191.)

On January 4, 2005, Hess was treated by Dr. Sutherland after complaining of shortness of breath and problems with his lungs. (R. at 190.) Hess's heart was

normal and lungs showed coarse rhonchi with inspiratory stridor and expiratory wheeze. (R. at 190.) Dr. Sutherland assessed that Hess had bright erythema of the posterior pharynx and nasal turbinates. (R. at 190.) Dr. Sutherland diagnosed Hess with maxillary sinusitis, COPD, sleep apnea, chronic emphysema, chronic fatigue syndrome and morbid obesity. (R. at 190.) Hess was prescribed Bidex and Zoloft. (R. at 190.)

On March 29, 2005, Hess returned to Dr. Sutherland's office to review the reports of his sleep apnea study, at which time he reported fatigue and problems with his lungs. (R. at 189.) Dr. Sutherland noted that the report from Dr. Robinette, regarding the sleep study, showed some sleep disturbance, but not definitive sleep apnea, and restless leg syndrome with claudication. (R. at 189.) Hess's heart and lungs were the same as previous visits, but Dr. Sutherland noted that Hess had severe hyperemia and muscle spasms over L3, L4 and L5. (R. at 189.) Dr. Sutherland diagnosed Hess with restless leg syndrome with sleep disturbance, chronic fatigue syndrome, chronic bronchitis, degenerative lumbar disc disease, bilateral sciatica and maxillary sinusitis. (R. at 189.) Dr. Sutherland prescribed Cipro, Theophylline, Effexor, Klonopin and Bidex. (R. at 189.)

On August 15, 2005, Hess was treated by Dr. Sutherland because of fatigue and lung trouble. (R. at 188.) Dr. Sutherland prescribed Spiriva inhaler, Ventolin inhaler and Zoloft. (R. at 188.) On January 30, 2005, it was noted that Hess was treated for his lungs and arthritis. (R. at 188.) Dr. Sutherland diagnosed Hess with

lumbar disc disease, bilateral sciatica, chronic bronchitis, external hemorrhoids, maxillary sinusitis and chronic fatigue. (R. at 188.)

On January 30, 2006, Hess was treated by Dr. Sutherland due to arthritis, hemorrhoids and trouble with his lungs. (R. at 187.) Hess's heart was normal and lungs demonstrated fine rhonci with inspiratory stridor and expiratory wheeze. (R. at 187.) Dr. Sutherland noted that Hess had intercostal retractions with respirations at 20 per minute. (R. at 187.) A rectal exam showed severe pruritus ani with rectal pain and a history of internal hemorrhoids was noted. (R. at 187.) Dr. Sutherland opined that a hemorrhoid surgery may be necessary. (R. at 187.) Dr. Sutherland assessed Hess with chronic obstructive lung disease, chronic bronchitis, internal and external hemorrhoids, maxillary sinusitis, degenerative lumbar disc disease, bilateral sciatica, chronic fatigue syndrome and rectal bleeding with pain. (R. at 187.) Dr. Sutherland prescribed Disalcylate, Spiriva inhaler, Zoloft, Anusol, Cipro, Tessalo Perles and Ventolin Inhaler. (R. at 187.)

On February 1, 2006, Hess presented to Dr. Sutherland with complaints of right flank pain. (R. at 186.) Hess opined that the pain could have been caused by his kidney, because he had a history of problems with his kidneys. (R. at 186.) Dr. Sutherland observed that Hess was ambulant with a steady gait, his heart was normal, there was respiratory distress, Lloyd's sign was negative, his range of motion was intact, his extremities had no edema or discoloration and there was

cerebrovascular tenderness.  (R. at 186.)  Dr. Sutherland diagnosed Hess with a urinary tract infection and prescribed Septra and Pyridium.  (R. at 186.)

On March 7, 2006, Hess returned to Dr. Sutherland, reporting back pain, recurrent leg pain and bronchitis.  (R. at 185.)  An examination revealed that Hess's heart and lungs were the same as previous visits, but that Hess had a decreased range of motion of the right hip in abduction and flexion, decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting and Hess could not do lumbar flexion, extension and rotation.  (R. at 185.)  Hess was diagnosed with degenerative lumbar disc disease, bursitis of the right hip, bronchitis and chronic fatigue syndrome.  (R. at 185.)

On March 29, 2006, Hess returned to Dr. Sutherland reporting recurrent chest pain, palpitations and a history of fever.  (R. at 184.)  Dr. Sutherland noted that Hess had a history of palpitations with retrosternal chest pain radiating into the right side of the neck and a questionable history of diaphoresis with shortness of breath on exertion.  (R. at 184.)  Hess's heart had a grade II/VI holosystolic murmur at T2nd interspace on the left without any evidence of diaphoresis.  (R. at 184.)  Additionally, Dr. Sutherland noted that Hess had costochondritis pain in ribs 3, 4 and 5, tenderness in the cervical spine over C4, C5 and C6 and carotids palpated equal bilaterally without bruits.  (R. at 184.)  Dr. Sutherland's diagnosis included palpitations with atypical chest pain, Barlow's syndrome with mitral

valve prolapse, functional grade II, chronic bronchitis and reflux esophagitis. (R. at 184.) Hess was placed on a Holter monitor and given nitroglycerin. (R. at 184.)


On April 3, 2006, Hess presented to Dr. Sutherland reporting problems with his lungs, shortness of breath and recurrent back pain. (R. at 183.) Hess's examination demonstrated intercostal retractions with respirations at 18 per minute and shortness of breath. (R. at 183.) Hess exhibited a decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting, Hess could not do lumbar flexion, extension and rotation and neuralgia radiated from both sclatica notches into the lateral margin of the foot. (R. at 183.) Hess was found to be alert and oriented in all spheres and there was no clubbing or cyanosis. (R. at 183.) Dr. Sutherland diagnosed Hess with Barlow's syndrome, paroxysmal tachycardia, chronic bronchitis with COPD, degenerative lumbar disc disease, bilateral sciatica, chronic fatigue syndrome, morbid obesity and bursitis of the right hip. (R. at 183.) Dr. Sutherland noted that a chest x-ray showed interstitial markings consistent with chronic bronchitis/emphysema, bilateral hilar scarring, there was no evidence of cardiomegaly or pleural effusion, no evidence of pneumonic infiltrate and there was slight hyperation of all lung fields. (R. at 183.) Dr. Sutherland opined that Hess had "complex problems that [were] unimproved over the last several months," and stated that "[Hess was] unable to do gainful employment effective 4/3/06." (R. at 183.)

Hess returned to Dr. Sutherland's office on May 11, 2006, complaining of back pain and to allow Dr. Sutherland to "recheck" his heart. (R. at 296.) The examination revealed the heart had regular beat and rhythm, no thrills or rubs and a grade II/IV holosystolic murmur with no evidence of diaphoresis. (R. at 296.) Hess's lungs showed fine rhonci with inspiratory stridor and expiratory wheeze and respirations where 18 per minute with wheezing. (R. at 296.) Dr. Sutherland also noted bright erythema of the posterior pharynx and nasal turbinates and swelling of the nasal mucosa. (R. at 296.) Dr. Sutherland also found that Hess had decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting and Hess could not perform lumbar flexion, extension and rotation. (R. at 296.) Hess was diagnosed with Barlow's syndrome, degenerative lumbar disc disease, upper respiratory infection, chronic bronchitis and maxillary sinusitis. (R. at 296.) Dr. Sutherland prescribed Singulair and Qdall. (R. at 296.)

Hess presented to Dr. Sutherland on June 14, 2006, reporting back pain and that his heart was beating fast. (R. at 295.) An electrocardiogram, ("EKG"), was normal, showing no signs of cardiac arrhythmia or other problems. (R. at 295.) The heart murmur was still present and the lungs checked out the same as other visits. (R. at 295.) Dr. Sutherland again noted that Hess had a decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting and Hess could not perform lumbar flexion, extension and rotation. (R. at 295.) Hess was diagnosed with paroxysmal atrial tachycardia, idiopathic, chronic bronchitis, degenerative lumbar disc disease and Barlow's syndrome. (R. at 295.)

On July 31, 2006, Hess again presented to Dr. Sutherland with complaints of back and joint pain. (R. at 294.) The examination revealed that Hess had passive and active decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting and he could not perform lumbar flexion, extension and rotation. (R. at 294.) Dr. Sutherland noted that Hess had impacted cerumen in both ears, bright erythema of the posterior pharynx and nasal turbinates and the lungs and heart were unchanged from prior visits. (R. at 294.) Hess was diagnosed with degenerative lumbar disc disease, impacted cerumen bilateral, otitis media, bronchitis with COPD, Barlow's syndrome and chronic fatigue syndrome. (R. at 294.) Dr. Sutherland prescribed Ventolin inhaler, Zoloft, Cipro, Spiriva inhaler and Singulair. (R. at 294.)

On September 5, 2006, Hess was treated by Dr. Sutherland for back pain, a cold, congestion and an earache. (R. at 293.) The examination did not reveal any changes with respect to Hess's heart, lungs or range of motion. (R. at 293.) Hess was diagnosed with degenerative lumbar disc disease, maxillary sinusitis, left otitis media, bilateral sciatica and reflux esophagitis. (R. at 293.) Hess was prescribed Cipro, Zantac, Vosul and Tussi Org with codeine. (R. at 293.)

On October 4, 2006, Hess returned to Dr. Sutherland's office reporting back and hip pain, as well as trouble with hemorrhoids. (R. at 292.) A rectal exam showed external and internal hemorrhoids with no evidence of rectal amplimasses. (R. at 292.) An examination revealed that Hess had decreased range of motion of

the lumbar spine in lifting, bending, stooping and squatting, and it was noted that he could not perform lumbar flexion, extension and rotation and had a decreased range of motion of both hips in abduction and flexion. (R. at 292.) Hess's heart was normal and his lungs were clear to auscultation, palpation and percussion. (R. at 292.) Hess was diagnosed with degenerative lumbar disc disease, bursitis of both hips, bilateral sciatica and external and internal hemorrhoids. (R. at 292.) Dr. Sutherland prescribed Anusol, Tessalon Perles and Proctofoam. (R. at 292.)

On November 8, 2006, Hess returned to Dr. Sutherland's office reporting back pain and trouble with his lungs. (R. at 291.) Hess's heart was normal, his lungs showed fine rhonci with inspiratory stridor and expiratory wheeze and Dr. Sutherland noted that Hess had "severe restriction in range of motion of the lumbar spine in lifting, bending, stooping and squatting." (R. at 291.) Hess was diagnosed with degenerative lumbar disc disease, bilateral sciatica and chronic bronchitis/COPD. (R. at 291.) Dr. Sutherland further noted that Hess was disabled and should avoid any manual labor including lifting. (R. at 291.)

On December 12, 2006, Hess was treated by Dr. Sutherland after reporting problems with his lungs and shortness of breath. (R. at 289-90.) Dr. Sutherland assessed Hess as suffering from chronic bronchitis. (R. at 289.) Dr. Sutherland noted that there was no organomegaly and Hess was experiencing pain in ribs three, four and five at the costosternal margins. (R. at 290.) Additionally, Dr.

Sutherland noted that there was abnormal air movement in Hess's lungs and/or chest. (R. at 290.)

On January 10, 2007, Hess presented to Dr. Sutherland reporting back pain, which Dr. Sutherland diagnosed as lumbar disc disease. (R. at 287-88.) Dr. Sutherland noted abnormalities during the physical examination of the lumbar spine and neuralgia. (R. at 288.) On January 23, 2007, Hess returned to Dr. Sutherland's office reporting back pain. (R. at 285-86.) Abnormalities were noted at the lumbar spine and during the leg lift, but the diagnoses and notes are illegible. (R. at 285-86.)

On February 7, 2007, Hess revisited Dr. Sutherland complaining of constipation, an earache and joint stiffness. (R. at 283-84.) Dr. Sutherland diagnosed Hess with otitis externa, irritable bowel syndrome with constipation, chronic fatigue syndrome and degenerative disc disease. (R. at 283.) Hess returned on March 7, 2007, with complaints of back tenderness and joint stiffness. (R. at 280.) Hess was diagnosed with a urinary tract infection, lumbar disc disease, bronchitis and chronic fatigue. (R. at 280.)

On April 2, 2007, Hess was treated by Dr. Sutherland for heart palpitations. (R. at 367, 380-81.) Hess was diagnosed with Barlow's syndrome, chronic fatigue syndrome, chronic bronchitis, palpitations with functional grade II murmur and

degenerative disc disease. (R. at 367, 380.) An EKG was normal and Dr. Sutherland noted a decreased range of motion in Hess's sciatica. (R. at 381.) Dr. Sutherland prescribed Klonopin. (R. at 367.) On April 24, 2007, Hess presented to Dr. Sutherland with back pain. (R. at 378-79.) Hess was diagnosed as suffering from Barlow's syndrome, lumbar disc disease, chronic fatigue and irritable bowel syndrome. (R. at 378.) Additionally, Dr. Sutherland noted Hess's decreased range of motion. (R. at 379.)

On May 21, 2007, Hess visited Dr. Sutherland's office and reported problems with his sinuses, allergies, his lungs and pain in his right ear. (R. at 376-77.) On June 5, 2007, Hess again presented to Dr. Sutherland complaining of stomach pain, which was attributed to irritable bowel syndrome and constipation. (R. at 374-75.) On June 19, 2007, Hess was treated by Dr. Sutherland for shortness of breath and palpitations, the remainder of the notes were illegible. (R. at 372-73.) On July 30, 2007, Hess presented to Dr. Sutherland complaining of back and joint pain, and Dr. Sutherland noted there were multiple trigger points along the spinal muscles. (R. at 370-71.) On August 28, 2008, Hess reported back pain, that he claimed stemmed from being hit in the back on August 18, 2008. (R. at 368.) Hess was diagnosed with lumbar disc disease, a fractured eighth rib, costochrondritis and right flank pain. (R. at 368.) On October 9, 2007, Hess presented to Dr. Sutherland with complaints of ear pain, joint pain and fatigue. (R. at 364.) Dr. Sutherland opined this was caused by aforementioned, recurrent problems. (R. at 364-65.)

On May 26, 2006, Hess presented to L. Andrew Steward, Ph.D., at Associated Counseling Services, Inc., for a psychological evaluation after being referred by Dr. Sutherland. (R. at 227-34.) Steward observed that Hess was talkative, well-dressed and groomed. (R. at 227.) Steward noted that Hess had trouble ambulating in and out of the testing room and winced in pain frequently. (R. at 228.) Hess was found to be oriented in all spheres and Dr. Steward noted that all mental and memory functions were significantly depressed. (R. at 228.) Steward noted that Hess had lung problems and chronic breathing troubles. (R. at 228.) Additionally, it was noted that Hess had hemorrhoids and had two past surgeries to alleviate the problem. (R. at 228.) Dr. Steward also mentioned that Hess had heart trouble, arthritis, back pain, a knot on his left tail bone, numbness in his extremities, sensitivity to light, problems with his prostate, kidneys and bladder, trouble with his teeth, ear pain and headaches. (R. at 229.) Also, Hess reported that "developmentally people misunderstood him and made fun of him." (R. at 229.)

Hess stated that he felt "nervous most of the time" and that he suffered from anxiousness. (R. at 229.) Hess also reported that he became irritated at the mention of his ex-wife and he was constantly angry when he was with her. (R. at 229.) Hess told Steward that he was depressed and suicidal when he got divorced, but that he was not homicidal. (R. at 229.) Hess also claimed that he did not have a good memory. (R. at 229.) Hess asserted that he did not have a good sleep schedule, but that he averaged five to six hours of sleep a night. (R. at 229.) Hess reported that he cried at times and would break down when driving. (R. at 229.)

Steward noted that Hess had low self-esteem and experienced feelings of uselessness and worthlessness. (R. at 229.) Hess disclosed that he was sexually abused when he was younger and suffered nightmares and ruminative thoughts, but was unsure about whether he experienced flashbacks. (R. at 229.) Steward noted that Hess had never been psychiatrically hospitalized nor had he been to any outpatient psychiatric services. (R. at 229.)

Hess stated that he spent his time cooking, cleaning, looking after his son and taking his son to ball games. (R. at 230.) Steward noted that Hess paid his bills, went to the grocery store, made the bed, cleaned the house, did the dishes, regularly attended church, visited his brother and drove. (R. at 230.) Hess reported that he did not have any hobbies, was not interested in people or things and did not help people as much as he would if he were more able to do so. (R. at 230.)

A Wechsler Adult Intelligence Scale – III, (WAIS-III), was administered to Hess, which indicated that he fell within the borderline intellectual functioning range. (R. at 232.) After analyzing the Verbal and Performance IQ scores, as well as the subtests, Steward opined that Hess's intellectual abilities were uniformly depressed. (R. at 232.) Steward noted that Hess was below average in all intellectual areas measured and his deficits included speed of performance, ability to discriminate essential from non-essential stimuli, flexibility in new learning situations, ability to use numbers and numerical operations, general fund of

knowledge, ability to use words, common sense judgment, abstract and concrete reasoning ability, short and long term memory processing, ability to interpret social situations and visual motor coordination skills.  (R. at 232.)  Furthermore, Steward noted that there "were no intellectual strengths."  (R. at 232.)

On the Beck Anxiety Inventory, Hess fell within the moderate anxiety ranges, with no behaviors reported that would place him in the severe degree.  (R. at 232.)  The moderate behaviors included wobbliness in the legs, unable to relax, fear of the worst-case scenario, heart pounding or racing, nervousness and difficulty breathing.  (R. at 232.)  The behaviors reported at the mild degree were numbness or tingling, feeling hot, dizzy or lightheaded, feelings of choking, hands trembling, shaky, fear of dying, scared, indigestion or abdominal discomfort, faint, face flushed and sweating, not caused by the heat.  (R. at 232.)

Steward also used the Beck Depression Inventory – III in the examination and it showed that Hess fell within the moderate depression range.  (R. at 232.)  Behaviors Hess reported to occur within the severe degree included finding it hard to get interested in anything and being too tired or fatigued to do most of the things he used to do.  (R. at 232.)  Behaviors that were reported by Hess to occur to a moderate degree included seeing a lot of failure in hind-sight, being restless or agitated to the point it was hard to stay still, having greater difficulty making decisions than in the past, lack of energy and finding it hard to focus for very long.  (R. at 232.)  Behaviors that occurred at the mild degree were increased

discouragement about the future, decreased enjoyment, feelings of guilt over things done or that should have been done, lost confidence, increased crying and increased sleeping and appetite. (R. at 232.)

Steward also administered the Minnesota Multiphasic Personality Inventory – 2nd Edition, ("MMPI-2"), which showed Hess was elevated in seven scales including those for anxiety and depression, with the depression scale being the most elevated. (R. at 233.) As a result, Hess's DSM-IV diagnoses were major depressive disorder, recurrent and moderate, generalized anxiety disorder, borderline intellectual functioning, multiple health problems, being disabled, being of lower income, relationship troubles and a history of past sexual abuse. (R. at 234.) Steward assessed Hess with a then-current Global Assessment of Functioning, ("GAF"), score of 45.[6] In summation, Steward opined that Hess was permanently and totally disabled from substantial and gainful activity, that Hess's prognosis appeared poor, but that Hess was capable of managing his funds. (R. at 234.)

On July 10, 2006, Steward reiterated the above findings in a Functional Mental Status Examination form. (R. at 235-37.) Steward noted that Hess's depression, anxiety and borderline intellectual functioning would preclude him from having the ability to follow and comprehend complex instructions, function

---

[6] A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

independently, relate to co-workers, supervisors and the public, respond appropriately to emotional stress, maintain attention and concentration and complete a normal workday. (R. at 236.) However, Steward found that Hess could understand and follow simple instructions and rules. (R. at 236.) Steward again noted that, in his opinion, Hess would be unable to sustain employment. (R. at 236-37.)

A Psychiatric Review Technique form, ("PRTF"), was completed by state agency psychologist, E. Hugh Tenison, Ph.D., on July 12, 2006. (R. at 238-251.) Tenison noted that his medical disposition was based upon Hess's affective disorders, mental retardation and anxiety-related disorders. (R. at 238.) For his opinion, Tenison reviewed the May 26, 2006, notes of Steward and he looked into Hess's allegations of Barlow's syndrome, chronic fatigue, degenerative disc disease, heart palpitations, sciatica, depression, pain in pelvic and prostate area, breathing problems, arthritis, panic attacks, chest pain, difficulty sleeping, difficulty concentrating and focusing, mind races, withdrawal from people and emotional or crying episodes. (R. at 250-51.)

Tenison found that Hess was experiencing an affective disorder, which caused a disturbance of his mood, namely depressive syndrome that was characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance and decreased energy. (R. at 241.) Additionally, Tenison deduced that Hess had borderline

intellectual functioning, which did not satisfy diagnostic criteria. (R. at 242.) Tenison noted that Hess experienced generalized persistent anxiety, but did not identify any accompanying criteria. (R. at 243.) Tenison found that Hess would experience mild limitations as to the restriction of activities of daily living and difficulties in maintaining social functioning; moderate limitations with difficulties in maintaining concentration, persistence or pace and no limitations with repeated episodes of extended duration decompensation. (R. at 248.) Tenison believed that Hess's mental allegations were not credible and that Steward's conclusions were not consistent with Hess's medical evidence of record. (R. at 251.) Tenison opined that, from a mental standpoint, Hess could perform simple, non-stressful work. (R. at 251.)

Also on July 12, 2006, Tenison completed a Mental Residual Functional Capacity Assessment, ("MRFC"), of Hess. (R. at 252-54.) Tenison found that Hess was "not significantly limited" in his ability to remember locations and work-like procedures, understand, carry out and remember very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in an unfamiliar place or use public transportation and set realistic goals or make plans independently of others. (R. at 253.) Tenison opined that Hess would be moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform

activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. (R. at 253.)

A consultative examination was performed by Dr. Muhammad R. Javed, M.D., a doctor with the Virginia Department of Rehabilitative Services, on October 30, 2006. (R. at 255-58.) Dr. Javed noted that Hess was referred for an evaluation of cardiovascular, respiratory and musculoskeletal impairments. (R. at 255.) Hess reported that he suffered from shortness of breath when walking uphill or climbing stairs, that he could only walk 50 or 60 feet on level ground before he would experience shortness of breath, night coughs that were not coupled with chest pain, that he experienced chest pain not related to exertion, that he had a history of depression, hemorrhoids, sleep difficulties, fatigued easily and often, pain in the lumbar spine, hip, knee joints and the foot and gout. (R. at 255.)

With regard to the physical examination, Dr. Javed noted that Hess did not use any assistive device in walking, nor did he have any difficulty getting on and off of the examination table. (R. at 256.) Dr. Javed's examination of the back and spine were normal except for mild tenderness in the lumbar spine, and all

movements of the joints, including the lumbar spine, were found to be within the normal range.  (R. at 256.)  The remaining areas assessed were also found to be unremarkable.  (R. at 256.)

Dr. Javed concluded that Hess had atypical chest pain, which was not ischemic in nature.  (R. at 257.)  Dr. Javed added that although Hess had been diagnosed with mitral valve prolapse, which could cause sharp chest pain, he did not hear a murmur.  (R. at 257.)  However, Dr. Javed noted that he would not rule out mitral valve prolapse; regardless, Dr. Javed stated mitral valve prolapse was a minor condition that could not cause disability.  (R. at 257.)  With regard to Hess's complaint of shortness of breath, Dr. Javed opined that Hess "most likely" had pneumoconiosis and/or COPD.  (R. at 257.)  As such, Dr. Javed found that Hess should avoid dusty environments, damp weather, exposure to chemicals and respiratory irritants and would not be able to walk uphill.  (R. at 257.)  Dr. Javed attributed Hess's lumbar spine, hip and knee pain to arthritis.  (R. at 257.)  Dr. Javed went on to say that all joint movements were found to be within the normal range.  (R. at 257.)  Additionally, Dr. Javed added that hemorrhoids were a chronic problem for Hess and he was being treated for depression.  (R. at 257.)

Dr. Tushar G. Patel, M.D., completed a Pulmonary Function Test Report of Hess on December 11, 2006.  (R. at 260.)  Dr. Patel noted that Hess performed spirometry test with and without bronchodilatation and put forth a "good effort." (R. at 260.)  Dr. Patel found that Hess's "spirometry [was] suggestive of mild

restrictive lung disease which improve[d] after bronchodilatation." (R. at 260.) Hess was treated with Albuterol and it was noted that he tolerated the treatment well and no adverse reactions were observed. (R. at 261.)

Hess was treated at Stone Mountain Health Services, ("SMHS"), on March 20, 2007, for a behavioral consultation with Chrystal Burke, LCSW. (R. at 317.) Hess described feeling like an "emotional wreck," and reported that he was often tearful, fatigued and anxious. (R. at 317.) Hess further claimed that he did not sleep well, that he felt like the world was crushing in on him, but denied any suicidal or homicidal ideations. (R. at 317.) Burke noted that Hess was anxious during the interview, both walking and shaking his leg throughout. (R. at 317.) Additionally, Burke found Hess to be alert and oriented, depressed and of proper hygiene and grooming. (R. at 317.) Burke did not feel that Hess demonstrated "obvious signs of psychotic symptoms." (R. at 317.) Burke assessed that Hess had multiple medical problems and was experiencing depression and anxiety. (R. at 317.) Burke and Hess discussed coping strategies and scheduled a follow-up visit. (R. at 317.)

Hess returned to SMHS on April 24, 2007, reporting that he had both good and bad days. (R. at 362.) Hess claimed that he had thought about past occurrences that caused him pain, such as his father's death and his divorce. (R. at 362.) Hess alleged that he had trouble getting things off of his mind, which interrupted his sleep schedule. (R. at 362.) Hess told Burke that he was taking

Clonazepam and Zoloft as prescribed by Dr. Sutherland. (R. at 362.) Hess stated that he was fatigued even after sleep, especially during the day, and stated that he felt overwhelmed. (R. at 362.) Burke noted that Hess was alert and oriented, properly groomed and exhibited proper hygiene; however, he appeared depressed and his speech and thought content were "circumstantial." (R. at 362.) Burke encouraged Hess to engage in relaxation techniques and advised him to create personal goals. (R. at 362.)

On June 5, 2007, Hess was treated at SMHS and reported feeling worthless, lonely and sad. (R. at 361.) Hess reported that he had been stressed about finances and had experienced "crying episodes." (R. at 361.) Additionally, Hess stated that his medication occasionally helped. (R. at 361.) Burke observed that Hess was alert and oriented, groomed, of proper hygiene, depressed, tearful and he sobbed twice during the interview. (R. at 361.) Burked added that Hess's thought content was noted for feelings of worthlessness. (R. at 361.) Burke discussed coping strategies with Hess, allowed Hess to "vent" and noted that Hess had problems with anxiety and depression. (R. at 361.)

On July 17, 2007, Hess returned to SMHS for treatment with Burke. (R. at 360.) Hess reported that he was overwhelmed, worried, anxious, irritable and obsessed about the stressors in his life. (R. at 360.) Also, Hess claimed he had experienced "crying episodes" and poor sleep. (R. at 360.) Hess was found to be alert and oriented, groomed, of proper hygiene, depressed, tearful and his thought

content was depressive, with self-defeating and worthlessness ideations. (R. at 360.) From the interview, Burke concluded that Hess exhibited some anxiety and depression and had poor coping strategies. (R. at 360.)

On August 28, 2007, Hess visited SMHS and was treated by Burke. (R. at 359.) Hess stated that he recently served as a chaperone for a church youth group outing and that it felt good to get out of the house and take his mind off of things. (R. at 359.) Hess claimed to feel overwhelmed with pain, other health issues and his son starting college. (R. at 359.) He alleged that he was often very emotional, but the medications were helping "some." (R. at 359.) Burke observed that Hess was alert, oriented, tearful, groomed, depressed and mildly anxious. (R. at 359.) Burke found that Hess was benefiting from medication and counseling. (R. at 359.)

A Physical Residual Functional Capacity Assessment, ("PRFC"), was completed by Dr. Donald Williams, M.D., a state agency physician, on January 10, 2007. (R. at 264-70.) A primary diagnosis of atypical chest pain and secondary diagnosis of pneumoconiosis was noted, with additional alleged impairments of COPD, mild degenerative arthritis and a history of hemorrhoids. (R. at 264.) Dr. Williams found that Hess could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours out of a typical eight-hour workday and that Hess's ability to push and/or pull was unlimited. (R. at 265.) Dr. Williams opined

that Hess could occasionally balance, stoop, kneel, crouch and crawl, [7] and no visual, communicative or manipulative limitations were noted. (R. at 266-67.) With respect to environmental limitations, Dr. Williams advised that Williams should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and avoid concentrated exposure to wetness, humidity and hazards. (R. at 267.) No limits were noted regarding Hess's exposure to extreme heat and cold, noise and vibration. (R. at 267.)

In drawing his conclusions, Dr. Williams reviewed notes from the treating source, Hess's statements and medical history, his symptoms and his activities of daily living. (R. at 268-69.) Dr. Williams noted that Hess attended church, performed household chores, watched television, sat on the porch, took care of himself, prepared meals, drove, shopped, went out to eat, talked on the phone and rode in a vehicle with others. (R. at 270.) Additionally, Dr. Williams mentioned that despite treatment, Hess continued to have pain that impacted his ability to work. (R. at 270.) Moreover, Dr. Williams thought that Hess's treatment was conservative in nature and "essentially routine." (R. at 270.) Based on the evidence considered, Dr. Williams stated that he found Hess's statements to be "partially credible." (R. at 270.)

Hess was treated at Buchanan General Hospital on February 26, 2007, by Dr. Jashbhai Patel, M.D., after complaining of abdominal pain. (R. at 271-76.) Hess reported that the pain was in the left lower quadrant and that it did not radiate

---

[7] Dr. Williams opined that Hess should never climb ropes, ladders or scaffolds, but that he could occasionally climb ramps. (R. at 266.)

or shift. (R. at 271.) Hess stated that he had been constipated, but was not vomiting or nauseous and that there was no hematemesis or melena. (R. at 271.) Hess was found to be alert and oriented and had an admitting diagnosis of occult gastrointestinal bleeding, constipation, abdominal pain, COPD, osteoarthritis, depression and hypertension. (R. at 271-72.) Hess underwent a flexible colonoscopy, which showed evidence of diverticulosis coli. (R. at 272.) After being observed in the ambulatory surgery center, Hess was discharged. (R. at 272.)

Dr. Shahane reviewed Dr. Williams's PRFC on May 14, 2007, and made findings identical to those contained in Dr. Williams's January 2007 evaluation. (R. at 319-25.)

Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed an MRFC on May 15, 2007. (R. at 326-28.) Milan found Hess to be moderately limited in his ability to carry out, understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond

appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. (R. at 326-27.) Hess was found to be not significantly limited in his ability to set realistic goals or make plans independently of others, travel in unfamiliar places or use public transportation, be aware of normal hazards and take appropriate precautions, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, ask simple questions or request assistance, make simple work-related decisions, sustain an ordinary routine without special supervision, carry out, remember and understand very short and simple instructions and remember locations and work-like procedures. (R. at 326-27.) Milan found that Hess could "meet the basic mental demands of competitive work on a regular, ongoing basis, despite the limitations arising from his symptoms." (R. at 328.)

Milan also reviewed a prior Psychiatric Review Technique form on May 15, 2007. (R. at 329-343.) The form Milan was reviewing noted affective disorders, mental retardation and anxiety-related disorders. (R. at 329.) Milan found that Hess exhibited depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance and decreased energy. (R. at 332.) Additionally, Milan opined that Hess suffered from borderline intellectual functioning and anxiety, but neither condition satisfied diagnostic criteria. (R. at 333-34.) Milan noted that Hess would experience "mild" limitations with the restriction of activities of daily living and difficulties in maintaining social functioning; "moderate" limitation in

difficulty maintaining concentration, persistence and pace and no limitation with repeated episodes of extended duration decompensation. (R. at 339.) Milan's reconsideration of the initial findings led him to note that there were no worsened or additional conditions. (R. at 342.) He also noted that the medications that were being prescribed to Hess in February 2007 did not include any psychiatric medications. (R. at 342.)

Hess was seen by Dr. Glen E. Vance, Jr., D.D.S., on April 23, 2007, for a dental procedure. (R. at 318.) Dr. Vance noticed that Hess cringed in pain when he was laid back on the table and seemed uncomfortable. (R. at 318.) Dr. Vance noted that as Hess's chair was raised he had an "extreme reaction to back pain," after which he could not stand for several minutes. (R. at 318.) Dr. Vance noted that Hess's pain and troubles were "evident," and wrote a letter to Hess's counsel after being informed of the disability claim. (R. at 318.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2009). If

the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520 (a) (2009).

Under this analysis, the claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 5, 2008, the ALJ denied Hess's claim. (R. at 12-21). The ALJ found that Hess met the insured status requirements of the SSA through December 31, 2010, and had not engaged in substantial gainful activity since April 3, 2006, the alleged onset date. (R. at 14.) The ALJ found that Hess suffered from the following severe impairments: obesity, borderline intellectual functioning, anxiety, depression, chronic obstructive pulmonary disease, ("COPD"), and/or pneumonitis, degenerative arthritis and mitral valve prolapse with atypical chest pain. (R. at 14-15.) However, the ALJ noted that Hess did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ determined that Hess had the residual functional capacity to perform

light work[8] that did not involve more than occasional climbing, balancing, kneeling, crawling, stooping and crouching. (R. at 16.) Further limitations noted by the ALJ included that Hess could not work in environments with air pollutants or irritants, wetness, temperature extremes or excessive humidity. (R. at 16.) Additionally, the ALJ found that Hess was limited to simple, routine, repetitive tasks that would require only occasional interaction with the general public and that Hess could not work around hazards, such as unprotected heights and/or dangerous/moving machinery. (R. at 16.) The ALJ decided that Hess could not perform any of his past relevant work and that the transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Hess was "not disabled," whether or not he had transferable job skills. (R. at 19-20.) Based on Hess's age, education, work experience and residual functional capacity, the ALJ found that other jobs existed in significant numbers in the national economy that Hess could perform, including jobs as a housekeeper, a stock clerk and an office machine operator. (R. at 20.) Accordingly, the ALJ decided that Hess was not under a disability as defined by the Act. (R. at 21.) See 20 C.F.R. § 404.1520(g)(2009).

Hess argues that the ALJ erred by not giving controlling weight to the opinion of his treating physician, Dr. Sutherland. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 14-16.) Alternatively, Hess argues that if not given controlling weight, the opinions of his treating

---

[8] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567 (b) (2009).

sources, Dr. Sutherland and psychologist Steward, should have been given greater weight than those of the non-treating, non-examining psychologists. (Plaintiff's Brief at 16-17.) Further, Hess argues that if the ALJ relied upon the findings of Tenison and Milan, which he feels the ALJ did not, (Plaintiff's Brief at 16), it was an error because Tenison and Milan did not review Burke's treatment records. (Plaintiff's Brief at 17.) Additionally, Hess argues that the ALJ erroneously substituted her lay opinion in the place of Steward's expert opinion. (Plaintiff's Brief at 18.) Lastly, Hess contends that the ALJ relied on Hess's household activities as evidence of ability to work in violation of Social Security Regulations. (Plaintiff's Brief at 18.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant

evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.)  While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first discuss Hess's claim that the ALJ should have given controlling weight to Dr. Sutherland's determination that Hess was totally disabled.  (Plaintiff's Brief at 14-16; R. at 183, 291.)  Moreover, Hess argues that it was an error for the ALJ to state that "[n]o treating physician has expressed an opinion regarding the claimant's ability to perform work related functions" and that the ALJ failed to even mention Dr. Sutherland's report.  (Plaintiff's Brief at 14.)  After careful consideration of the record, I find that Dr. Sutherland's opinion was not entitled to controlling weight and the ALJ gave proper consideration to his findings.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases.  *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983).  The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  20 C.F.R. § 404.1527(d)(2). However, "circuit precedent does not require that a treating physician's testimony

'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if she sufficiently explains her rationale and if the record supports her findings. Furthermore, only an ALJ can determine disability, a statement by a medical source that a claimant is "disabled" or "unable to work" is not definitive. *See* 20 C.F.R. § 404.1527(e). *See also* 20 C.F.R. § 404.1503.

In light of the previous discussion, Dr. Sutherland's findings were not entitled to "controlling weight," nor were his determinations that Hess was "totally disabled" and "unable to do gainful employment" entitled to any deference by the ALJ. (R. at 183, 291.) Dr. Sutherland's findings were inconsistent and directly contradicted by those of Drs. Javed, Williams and Shahane. (R. at 255-58, 264-270, 319-25.)

Based upon his examination and consideration of Hess's medical history, Dr. Javed concluded that Hess had atypical chest pain, which was not ischemic in nature, that could possibly be caused by mitral valve prolapse;[9] that Hess "most

---

[9] Dr. Javed noted that he did not hear a murmur, which is associated with mitral valve prolapse,

likely" had COPD and/or pneumoconiosis, which would require him to avoid dusty environments, damp weather, exposure to chemicals and respiratory irritants and walking uphill. (R. at 257.) Dr. Javed said this diagnosis could be confirmed by x-rays and pulmonary function tests and that while Hess reported pain in his back, hip joints and knee joints, all movements were within the normal range of motion and the pain could be explained by degenerative arthritis. (R. at 257.) Additionally, Dr. Javed merely noted that Hess had a history of depression, gouty arthritis and chronic hemorrhoids. (R. at 257.) Dr. Javed's finding that Hess had a normal range of motion, (R. at 257-58), was in direct contradiction to Dr. Sutherland's finding that Hess had a decreased range of motion of the lumbar spine in lifting, bending, stooping and squatting and that he could not do lumbar flexion, extension and rotation. (R. at 183, 185, 291-96.) Likewise, the doctors are at odds over the ailments suffered by Hess; while Dr. Sutherland's diagnoses included Barlow's syndrome, paroxysmal tachycardia, chronic bronchitis with COPD, degenerative disc disease of the lumbar spine, bilateral sciatica, palpitations, chronic fatigue syndrome, morbid obesity and bursistis of the right hip, (R. at 183), Dr. Javed simply diagnosed atypical chest pain, possible COPD and/or pneumoconiosis, probable degenerative arthritis and a history of depression, gouty arthritis and hemorrhoids. (R. at 257.)

Furthermore, Dr. Williams's findings are inconsistent with Dr. Sutherland's, as Dr. Williams indicated on the PRFC form. (R. at 268.) Dr. Williams found that Hess could occasionally lift and/or carry items weighing up to 20 pounds,

---

but he would not rule it out; nor did he feel the need to because it could not cause disability. (R. at 257.)

frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours out of the typical eight-hour workday and that Hess's abilities to push and pull were unlimited; additionally, he found that Hess could occasionally balance, stoop, kneel, crouch, crawl and climb ramps. (R. at 265-67.) It can be inferred from Dr. Sutherland's opinions that Hess was "totally disabled" and "unable to do gainful employment," (R. at 183, 291), that he would not find that Hess would be able to participate in such activities. Further, as Dr. Shahane reviewed Dr. Williams's findings and noted that he "suggest[ed] no changes to the original decision," his opinion would also be inconsistent with that of Dr. Sutherland. (R. at 325.)

Hess also argues that the ALJ erred by failing to mention Dr. Sutherland's opinion. (Plaintiff's Brief at 14.) While the ALJ did not explicitly mention Dr. Sutherland by name, she did note consideration of Dr. Sutherland's findings and treatment records. (R. at 18.) The ALJ referred to Exhibit 3F and 22F, which are medical records from Dr. Sutherland, and also noted that Dr. Sutherland diagnosed degenerative disc disease of the lumbar spine without having supporting x-rays. (R. at 18-19.) Thus, it is apparent that the ALJ considered Dr. Sutherland's opinion, but failed to follow or be persuaded by it.

As for the ALJ's comment that "[n]o treating physician has expressed an opinion regarding the claimant's ability to perform work related functions," this can be inferred to mean that no treating physician completed the standard forms gauging a claimant's ability to perform work-related activities, such as a PRFC. Rather, Dr. Sutherland simply stated that Hess was "totally disabled" and "unable

to do gainful employment," (R. at 183, 291), which are determinations reserved to the ALJ under the Act.  *See* 20 C.F.R. § 404.1527(e); s*ee also*, 20 C.F.R. § 404.1503.  Regardless, the statements that Hess was "totally disabled" and "unable to do gainful employment" does not speak as to his ability to perform specific *work-related functions*.

Accordingly, I am of the opinion that the ALJ properly weighed the findings and opinions of Dr. Sutherland and did not err in failing to provide them controlling weight.

Next, the court will consider Hess's argument that Dr. Sutherland's and psychologist Steward's opinions should have been given greater weight than those of non-treating, non-examining psychologists.  (Plaintiff's Brief at 16-17.) Further, Hess argues that, if the opinions of psychologists Milan and Tenison were considered, it was in violation of the Act because they did not review Burke's records.  (Plaintiff's Brief at 17.)

The Fourth Circuit Court of Appeals has enunciated several principles regarding the treatment of the testimony from a non-examining, non-treating physician.  In *Martin v. Secretary*, 492 F.2d 905, 908 (4th Cir. 1974), the court indicated that such testimony should be discounted and does not constitute substantial evidence when it is totally contradicted by other evidence in the record. However, the court ruled in *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971), that the testimony of a nonexamining, nontreating physician can be used and relied upon if it is consistent with the record.  Finally, "if the medical expert testimony

44

from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds [herself] should stand." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Hess indicates that every psychologist and physician who treated him diagnosed him with depression. (Plaintiff's Brief at 16.) While this may be true, it does not, in and of itself, render him disabled. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ found that Hess suffered from depression, as well as other non-exertional impairments including, borderline intellectual functioning and anxiety. (R. at 14-15.) Thus, Hess pointing out that he has been diagnosed with depression is not contradicted by the ALJ's findings. However, after considering "paragraph B" and "paragraph C" criteria, the ALJ found that the impairments did not individually or in combination satisfy the criteria of listing 12.04 or 12.06. (R. at 15-16.)

The ALJ noted that Hess did not seek counseling until March 2007, 11 months after the alleged onset date. (R. at 19.) After consideration of counselor Burke's treatment notes, the ALJ concluded that Hess's "statements concerning the intensity, persistence and limiting effects" of his pain to be not credible. (R. at 18.) Burke consistently found Hess to suffer from depression, (R. at 317, 359-63), and also noted that he was experiencing anxiety. (R. at 317, 359-61, 363.) However, on August 28, 2007, Hess's last documented visit with Burke of record, she found that Hess "was benefiting from medicines and counseling for development of

coping." (R. at 359.) Additionally, Hess reported that the medications had helped treat his psychological symptoms. (R. at 359.)

In addition to Burke, Hess was seen by psychologist Steward on May 26, 2006, (R. at 227-34), and Steward completed a Functional Mental Status Evaluation on July 10, 2007. (R. at 237.) Steward found that Hess's depression, anxiety and borderline intellectual functioning precluded him from having the ability to follow and comprehend complex instructions, function independently, relate to co-workers, supervisors and the public, respond appropriately to emotional stress, maintain attention and concentration and complete a normal workday. (R. at 236.) Steward opined that Hess was disabled and would be unable to hold employment. (R. at 234, 236.) Dr. Sutherland diagnosed Hess with major depressive disorder, recurrent, moderate, generalized anxiety disorder and borderline intellectual functioning. (R. at 233.) Additionally, Steward assessed Hess with a then-current GAF score of 45. (R. at 234.)

The ALJ noted, in consideration of the pertinent credibility factors, that Hess had mild restrictions in his activities of daily living, because he was independent and able to care for himself, his son and his home; he had only mild difficulties with social functioning, having chaperoned a youth trip, took his son to ball games, participated in church activities, socialized with friends, shopped, drove and interacted with the general public; he had moderate difficulties with persistence, concentration or pace, due to the fact that while he claimed to have difficulty concentrating, he drove, balanced his checkbook and completed household activities and he had no episodes of decompensation. (R. at 16.) The ALJ stated

that "[t]he opinion of Dr. Steward that the claimant's GAF was 45 only one month after he quit working was not given any significant weight because it was inconsistent with other substantial evidence including the claimant's own activities of daily living."  In conjunction with her findings, the ALJ imposed non-exertional limitations of working in simple, routine, repetitive tasks that would require only occasional interaction with the general public and would preclude working around hazards such as unprotected heights and/or dangerous/moving machinery.  (R. at 16.)

It is not necessary to go into as lengthy of a discussion with regard to Dr. Sutherland's opinion, as it was discussed in great detail with respect to the first issue.  As discussed above, the opinions of a treating physician are not entitled to controlling weight and may be given less weight if not supported by substantial evidence of record; with regard to the opinions of Dr. Sutherland, the ALJ found Dr. Javed's opinion to be more persuasive and consistent with the record.  (R. at 18.)  Additionally, the ALJ noted that while Dr. Sutherland diagnosed degenerative disc disease, there were no x-rays that support such a diagnosis.   (R. at 18.)  Accordingly, the ALJ decided to disregard the opinions of Dr. Sutherland in favor of those of Dr. Javed.  Although the ALJ found that Hess suffered from severe impairments such as obesity, COPD and/or pneumontitis, degenerative arthritis and mitral valve prolapse with atypical chest pain, he found that the conditions did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1  (R. at 14-15.)

The ALJ concluded that Steward's findings were contradicted by substantial evidence of record, "including the claimant's own activities of daily living." (R. at 19.) I am of the opinion that the ALJ's decision regarding psychological limitations was supported by substantial evidence of record, including Burke's treatment notes and Hess's description of his daily activities. Furthermore, the ALJ properly weighed the evidence of physical findings and accorded greater weight to Dr. Javed in light of his opinions being more consistent with objective evidence. With respect to Hess's claim that if "the ALJ be deemed to have relied on the opinions of Tenison and Milan, she did so in further violation of [the Commissioner's] own regulations …," the court finds this argument to be without merit. After consideration of the ALJ's decision, it appears that she was not influenced by Tension or Milan, but rather was greatly influenced by Burke's treatment notes and Hess's testimony.

Finally, the court will consider Hess's argument that the ALJ erred by substituting her opinion for that of Dr. Steward. (Plaintiff's Brief at 18.) Further, Hess claims that it was error for the ALJ "to rely on household activities as evidence of ability to work." (R. at 18.) The court finds both of these claims to be without merit.

"In the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the competency to substitute [her] views on the severity of the plaintiff's psychiatric problems for that of a trained professional." *Grimmet v. Heckler*, 607 F. Supp. 502, 503 (S.D.W.Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir.

1974)).  However, that is not what happened in the instant case.  As previously discussed, the ALJ attributed less weight to the opinion of Dr. Steward in favor of substantial evidence of record including, the treatment notes from counselor Burke and Hess's testimony.  Furthermore, despite Hess's claim that consideration of Tenison and Milan's opinions would be in error, they support the ALJ's findings.  Milan stated that Hess could "meet the basic mental demands of competitive work on a regular, ongoing basis, despite the limitations arising from his symptoms." (R. at 328.)  While Tenison found that, from a mental stand point, Hess had the ability to maintain employment.  (R. at 251.)  Accordingly, this was not a situations where the ALJ substituted her opinion for that of Steward; rather, it was a decision not to follow Steward's opinion after consideration of the evidence of record.

A careful reading of the ALJ's opinion disposes of Hess's claim that she relied in error on household activities as evidence of the ability to work. (Plaintiff's Brief at 18.)  The ALJ considered Hess's daily activities, including household chores, pursuant to 20 C.F.R. § 404.1529(c) when assessing his credibility, not his ability to engage in substantial gainful activity.  (R. at 17.) Thus, the ALJ did not substitute her opinion in error, nor did she consider Hess's daily activities wrongfully.

### IV. Conclusion

For the foregoing reasons, I will affirm the final decision of the Commissioner denying benefits.

An appropriate order will be entered.

**ENTER:** This, 24th day of November, 2009.

**/s/  Glen M. Williams**_____
**SENIOR UNITED STATES DISTRICT JUDGE**
